**BRICKWOOD CONTRACTORS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 99–388C.

United States Court of Federal Claims.

April 9, 2001.

Robert M. Moore, Moore & Lee, LLP, McLean, Virginia, attorney of record for the plaintiff, Charlie C.H. Lee and Kristen A. Bennett, of counsel.

Paul M. Faver, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., Robert E. Kirschman, Assistant Director, David M. Cohen, Director, attorneys of record for the defendant.

## ORDER

HORN, Judge.

This matter comes before the court on the application of Brickwood Contractors, Inc. (Brickwood) for attorneys' fees and other expenses under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412 (1994 & Supp. IV 1998). Plaintiff argues that it is entitled to an award of attorneys' fees and expenses under EAJA because (1) plaintiff's bid protest prevented the Navy from converting an invitation for Bids (IFB) to a Request for Proposals (RFP), thereby making the plaintiff the prevailing party in the matter; and (2) the government could not have met the regulatory requirements for such a conversion from an IFB to an RFP under Federal Acquisition Regulation (FAR) 14.404–1, for which reason the United States was not substantially justified in its actions. Plaintiff meets the eligibility criteria under the EAJA and seeks $11,134.22 in fees and expenses incurred in pursuing the bid protest and the instant application. After careful consideration of the record before the court and the applicable law, the court finds that the defendant is liable to the plaintiff for EAJA fees and expenses.

## FINDINGS OF FACT

On February 9, 1999, the Department of the Navy issued IFB No. N62477–97–B–0083, Repair Elevated Water Storage Tanks, Naval Air Station, Patuxent River, Maryland. On March 24, 1999, the Navy issued Amendment 0003, which added three options to the original IFB and solicited bids for each of these options. The Amendment 0003 options included removing contaminated paint, performing wipe samples, testing the wipe samples, and disposing of all contaminated and uncontaminated waste. Amendment 0003 also added an Evaluation of Options Clause which provided:

> Except when it is determined in accordance with FAR 17.206(b) not to be in the Government's best interests, the Government will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement. Evaluation of option(s) will not obligate the Government to exercise the option(s).

On March 30, 1999, the Navy issued Amendment 0004, which among other changes, added PCB (Polychlorinated Biphenyl) contamination testing to the base requirements. Amendment 0004 explained the criteria for exercising the options by stating:

> [I]f the above testing reveals that the exterior and/or interior paint coatings do contain PCB levels equal to or greater than 50 PPM, the elevated water storage tank debris will be considered a hazardous waste. In that event, the Government will award Options 1, 2, and/or 3 as the test results warrant.

On April 6, 1999, five bids, including that of the plaintiff, were received and publicly opened. Based upon the total price (base bid plus options), the Navy identified plaintiff as the apparent low bidder. Due to significant disparities in the bids, however, the Navy requested a bid analysis to determine if the bids were unbalanced. Alpha Corporation, an independent consulting firm, issued a report on April 14, 1999, which stated:

1. There appears to be a considerable difference in the Bidders' understanding of the scope of work involved with the bid options.... As we all know, the interpretation of environmental regulatory requirements is both complex and variable. While the two low bidders interpreted the bid options properly, the other three low bidders appear to have misinterpreted the bid option requirements.

2. Because of the limited number of bidders, resulting from the limited number of appropriate tank manufacturers, statistical analysis of the distribution of bids is inconclusive. We feel that the even distribution of base bids within the bid result range (96% to 155% of the Government estimate) is common and appropriate.

Pursuant to Amendment 0004, the base specifications would have required the contractor to test for PCB contamination. However, in late April 1999, the Navy conducted tests on the water towers to determine if the options would ever need to be exercised. On April 29, 1999, the Navy concluded that there was no evidence of PCB contamination. Therefore on May 5, 1999, the Navy issued a Determination and Findings for Evaluating Bids Exclusive of Options, announcing that the bids on the options would be excluded from the final price evaluation because they were no longer needed. If the options had been evaluated along with the base bids, plaintiff would have had the low bid. If the options had not been evaluated, plaintiff would have been displaced by two other bidders who had lower base bids.

On June 15, 1999, the Navy issued Amendment 0005 to the solicitation, which did not cancel,[1] but extended, the solicitation by stating: "By amendment, this invitation for Bids (IFB) will be converted to a Request for Proposal (RFP) by the authority of Federal Acquisition Regulation (FAR) Part 14.404–1." Because the government determined that the tanks contained no contaminated paint and that the options would never be exercised, Amendment 0005 also deleted the Evaluation of Options Clause and eliminated the requirements regarding PCBs.

On June 18, 1999, plaintiff filed a bid protest in the United States Court of Federal Claims alleging that "[t]he Navy's attempt to convert an IFB to an RFP, however, is not authorized by FAR or any other law or regulation." Plaintiff requested the court to enter judgment "enjoining the Navy from converting the IFB to an RFP," and "directing that the Navy proceed with the award of the contract to Brickwood."

On July 16, 1999, after plaintiff filed its lawsuit, the defendant issued Amendment 0009, by which the government did cancel the solicitation (N62477–97–R–0083), with the intention of offering a new IFB, this time without options and without a requirement for PCB testing. The Navy issued a Determination and Findings for Cancellation of Solicitation on July 16, 1999, stating that the "otherwise inadequate or ambiguous specifications for this project warrant cancellation and re-solicitation." Defendant filed a motion to dismiss in this court, arguing that "[b]ecause the cancellation renders the plaintiff's claim moot, the Court lacks jurisdiction and should dismiss this action." This court dismissed plaintiff's protest on July 22, 1999, without reaching the merits of the case.

The next day, on July 23, 1999, plaintiff filed a second bid protest, this time contesting the cancellation of the IFB. The plaintiff requested the court to "[d]eclare that the cancellation of the IFB was improper and enjoin further action by the Navy to resolicit

---

1. In his brief, defendant's counsel attempts to recharacterize the June 15, 1999 Amendment 0005 by stating, "Amendment 0005 *cancelled* the solicitation, rejected all bids, and stated that the agency would complete the procurement through price negotiations." (emphasis added). The same counsel for defendant, however, attaches the later, July 16, 1999 Amendment 0009 as evidence of cancellation of the solicitation.

the services under a new IFB" and "[d]eclare that Brickwood is entitled to award of the contract under the procurement at issue in this action." The plaintiff alleged that the Navy's cancellation of the IFB had violated the FAR, constituted a breach of the implied obligation to treat each bid fairly and honestly, and initiated an improper auction. After reviewing the plaintiff's complaint and the applicable regulations, the court informed the plaintiff that it did not believe "that the Navy ha[d] acted arbitrarily or capriciously in canceling the bid and moving to award the contract through the issuance of a new solicitation." The plaintiff voluntarily dismissed its second bid protest on September 27, 1999. On August 23, 1999, the Navy issued a new solicitation (N62477–99–B–0088) for work on the water tanks at the Patuxent River Naval Air Station which did not include the PCB requirements. Brickwood was ultimately awarded the Patuxent River Naval Air Station contract on January 10, 2000.

On August 23, 1999, plaintiff filed an EAJA application seeking attorneys' fees and expenses for work performed on the first lawsuit protesting the Navy's conversion to an RFP and on the instant EAJA application. Plaintiff's itemized statement reflects that it seeks fees and expenses incurred from June 16, 1999 to August 20, 1999, thereby excluding any claim for fees and expenses associated with the second bid protest.

## DISCUSSION

### I. Background of EAJA and EAJA Requirements

"In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *see also Arcambel v. Wiseman*, 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796). "Absent statute or enforceable contract, litigants pay their own attorney's fees." *Alyeska Pipeline Serv. Co. v. Wilderness*

*Soc'y*, 421 U.S. at 257, 95 S.Ct. 1612 (citations omitted). This has come to be known as the "American Rule," and the only exceptions to this rule are those created by Congress and a small group of common law equitable exceptions which federal courts lack the power to enlarge. *See id.* at 269, 95 S.Ct. 1612.[2] In addition, litigants seeking to recoup litigation expenses from the United States also face the barrier of sovereign immunity. *See Chiu v. United States*, 948 F.2d 711, 714 (Fed.Cir. 1991); *Gavette v. Office of Pers. Mgmt.*, 808 F.2d 1456, 1460 (Fed.Cir.1986); *Griffin & Dickson v. United States*, 21 Cl.Ct. 1, 4 (1990). Only a statutory directive waiving immunity can make the United States potentially liable in suit. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957).

Congress recognized that the American Rule deterred individuals and small businesses "from seeking review of, or defending against unreasonable governmental action because of the expense involved in securing the vindication of their rights." *Gavette v. Office of Pers. Mgmt.*, 808 F.2d at 1459 (quoting H.R.Rep. No. 96–1418, at 5 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4984); *see also PCI/RCI v. United States*, 37 Fed.Cl. 785, 788 (1997) (also quoting from H.R.Rep. No. 96–1418, at 5, 1980 U.S.C.C.A.N. at 4984). When the House of Representatives considered the Equal Access to Justice Act, it provided the following rationale:

> For many citizens, the costs of securing vindication of their rights and the inability to recover attorney fees preclude resort to the adjudicatory process. When the cost of contesting a Government order, for example, exceeds the amount at stake, a party has no realistic choice and no effective remedy. In these cases, it is more practical to endure an injustice than to contest it.

2. The Supreme Court in *Alyeska* noted the equitable exceptions of (1) willful disobedience of a court order, (2) bad faith on the part of a losing party, and (3) the common fund or common benefit exception allowing recovery of costs

when the prevailing party is a trustee of property or is a party preserving or recovering a fund for the benefit of others in addition to himself. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. at 257–59, 95 S.Ct. 1612.

H.R.Rep. No. 96–1418, at 9, 1980 U.S.C.C.A.N. at 4988.

To address these concerns, in 1980, Congress enacted the EAJA. The purpose of the EAJA was to "reduce the deterrents and disparity by entitling certain prevailing parties to recover an award of attorney's fees, expert witness fees and other expenses against the United States." *Gavette v. Office of Pers. Mgmt.*, 808 F.2d at 1459–60 (quoting H.R.Rep. No. 96–1418, at 6, 1980 U.S.C.C.A.N. at 4984); *see also PCI/RCI v. United States*, 37 Fed.Cl. at 788 (also quoting from H.R.Rep. No. 96–1418, at 6, 1980 U.S.C.C.A.N. at 4984).

In order to accomplish its purpose, EAJA made two primary changes in the then prevailing law. *Gavette v. Office of Pers. Mgmt.*, 808 F.2d at 1460 (citing H.R.Rep. No. 96–1418, at 9, 1980 U.S.C.C.A.N. at 4987). First, EAJA section 2412(b) extended the existing common law and statutory exceptions to the American Rule to make the United States liable for attorney's fees just as private parties would be liable. *Id.* (citing H.R.Rep. No. 96–1418, at 9, 17, 1980 U.S.C.C.A.N. at 4987, 4996).[3] That section reads:

(b) Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms

of any statute which specifically provides for such an award.

28 U.S.C. § 2412(b). Prior to EAJA, many different statutes had contained specific waivers of sovereign immunity for the United States. *Gavette v. Office of Pers. Mgmt.*, 808 F.2d at 1460. EAJA section 2412 was enacted to provide a "uniform rule" which would "make such specific exceptions unnecessary." *Id.* (citing 28 U.S.C.A. § 2412 (Historical and Statutory Notes)).

The second primary change made by EAJA section 2412, given the ability of a party to collect fees against the government, was a statutory presumption that those awards were to be made "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A); *see* H.R.Rep. No. 96–1418, at 9, 1980 U.S.C.C.A.N. at 4987–88. EAJA section 2412(d)(1)(A) states:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). The "position of the United States" is further defined in EAJA section 2412(d)(2)(D) to mean:

[I]n addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which

---

3. The House Committee on the Judiciary stated that:

Section 2412(b) permits a court in its discretion to award attorney's fees and other expenses to prevailing parties in civil litigation involving the United States to the same extent it may award fees in cases involving other parties. Thus, under this subsection, cases involving the United States would be subject to the "bad faith," "common fund" and "common benefit" exceptions to the American rule against fee-shifting. The United States would

also be liable under the same standards which govern awards against other parties under Federal statutory exceptions, unless the statute expressly provides otherwise.

*Gavette v. Office of Pers. Mgmt.*, 808 F.2d at 1460 (citing H.R.Rep. No. 96–1418, at 17, 1980 U.S.C.C.A.N. at 4996; *see, e.g., Knight v. United States*, 982 F.2d 1573, 1579–82 (Fed.Cir.1993) (common fund exception); *St. Paul Fire & Marine Ins. Co. v. United States*, 4 Cl.Ct. 762, 769 (1984) (bad faith exception).

the civil action is based; except that fees and expenses may not be awarded to a party for any portion of the litigation in which the party has unreasonably protracted the proceedings.

28 U.S.C. § 2412(d)(2)(D).

The United States Supreme Court noted in *Commissioner, Immigration & Naturalization Service v. Jean,* 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990), that "[a]ny given civil action can have numerous phases. While the parties' postures on individual matters may be more or less justified, the EAJA—like other fee-shifting statutes—favors treating a case as an inclusive whole, rather than as atomized line-items." *Id.* at 161–62, 110 S.Ct. 2316. This position is reflected in United States Court of Appeals for the Federal Circuit cases. *See Gavette v. Office of Pers. Mgmt.,* 808 F.2d at 1467 (position of the United States includes that taken by the agency at the administrative level); *accord Doty v. United States,* 71 F.3d 384, 385–86 (Fed.Cir.1995); *Chiu v. United States,* 948 F.2d 711, 715 (Fed.Cir.1991) ("[W]hen assessing whether to award attorney's fees incurred by a party who has successfully challenged a governmental action in a particular court, the entirety of the conduct of government is to be viewed, including the action or inaction by the agency prior to litigation."); *KMS Fusion, Inc. v. United States,* 39 Fed.Cl. 593, 597 (1997).

Thus, eligibility for an award of attorney's fees and expenses in a civil action requires (1) that the claimant be a prevailing party; (2) that the government's position viewed over the entire course of the dispute was not substantially justified; (3) that no special circumstances make an award unjust; and (4) that pursuant to section 2412(d)(1)(B), any fee application be submitted to the court within thirty days of final judgment in the action and be supported by an itemized statement. *See Comm'r. Immigration & Naturalization Serv. v. Jean,* 496 U.S. at 158, 110 S.Ct. 2316; 28 U.S.C. § 2412(d)(1)(A).

## A.  Prevailing Party Status

■ To satisfy the first EAJA requirement, a plaintiff is a prevailing party if entitlement to some relief on the merits of one or

more claims is established. *See Hensley v. Eckerhart,* 461 U.S. 424, 433 & n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (standard is generally applicable in cases for which Congress authorizes an award of fees to a "prevailing party"); *Brewer v. American Battle Monuments Comm'n,* 814 F.2d 1564, 1567–69 (Fed. Cir.1987). In *Austin v. Department of Commerce,* 742 F.2d 1417 (Fed.Cir.1984), the United States Court of Appeals for the Federal Circuit wrote:

Although the EAJA does not define the term "prevailing party," "[a] typical formulation is that plaintiffs may be considered 'prevailing parties' for attorney fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit," *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). The legislative history makes clear that prior judicial interpretations of the term "prevailing party" should be applied to the Equal Access to Justice Act and that the phrase should not be limited "to a victor only after entry of a final judgment following a full trial on the merits." H.R.Rep. No. 1418, 96th Cong., 2d Sess. 11, *reprinted in* 1980 U.S.Code Cong. & Ad. News 4984, 4990. A party will be deemed prevailing if he obtains a settlement of his case; if the plaintiff has sought a voluntary dismissal of a groundless complaint; or even if he does not ultimately prevail on all issues. *Id.* The legislative history goes on to state:

In cases that are litigated to conclusion, a party may be deemed "prevailing" for purposes of a fee award in a civil action prior to the losing party having exhausted its final appeal. A fee award may be appropriate where the party has prevailed on an interim order which was central to his case, *Parker v. Matthews,* 411 F.Supp. 1059, 1064 (D.D.C.1976), or where an interlocutory appeal is "sufficiently significant and discrete to be treated as a separate unit," *Van Hoomissen v. Xerox Corp.,* 503 F.2d 1131, 1133 (9th Cir.1974).

It is therefore clear that a party need not have litigated to final judgment and have been awarded the ultimate relief requested in order to be entitled to an award of fees under the EAJA. As stated recently by this court, "[a] court should look to the substance of the litigation to determine whether an applicant has substantially prevailed in its position, and not merely the technical disposition of the case or motion." *Devine v. Sutermeister*, 733 F.2d 892, 898 (Fed.Cir.1984).

*Austin v. Dep't of Commerce*, 742 F.2d at 1419–20.

Similarly, the United States Court of Appeals for the District of Columbia, in an action brought pursuant to the EAJA, determined that "[a] party need not procure a final judgment on the merits in order to be considered a 'prevailing party' for fee-shifting purposes. It is enough that the lawsuit was a 'causal, necessary, or substantial factor in obtaining the result' plaintiff sought." *Public Citizen Health Research Group v. Young*, 909 F.2d 546, 549 (D.C.Cir.1990) (quoting *Comm'rs Court of Medina County, Texas v. United States*, 683 F.2d 435, 442 (D.C.Cir.1982)).

Furthermore, in *Miley v. Principi*, 242 F.3d 1050 (Fed.Cir.2001), the court held that: "We agree ... that there is no absolute prohibition against basing such a showing [of causation] on timing alone." The *Principi* court also stated that: "Thus, in *Public Citizen Health Research Group v. Young*, 909 F.2d 546 (D.C.Cir.1990), the court noted that the basic inquiry under the catalyst theory [4] is one of causation, and that in the absence of alternative explanations, a lawsuit followed by agency action can be strong evidence of causation." *Id.* at 551 (citing *Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 51 (D.C.Cir.1987)); *see also Hooper v. Demco, Inc.*, 37 F.3d 287, 292 (7th Cir.1994). *Id.* at 1054.

In a case interpreting the prevailing party requirement with respect to obtaining attorney's fees under 42 U.S.C. § 1988,[5] the United States Supreme Court, in *Hewitt v. Helms*, 482 U.S. 755, 760–61, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987) offered the following advice:

> It is settled law, of course, that relief need not be judicially decreed in order to justify a fee award under [42 U.S.C.] § 1988. A lawsuit sometimes produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment—e.g., a monetary settlement or a change in conduct that redresses the plaintiff's grievances. When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor.

*Hewitt v. Helms*, 482 U.S. at 760–61, 107 S.Ct. 2672. Although the *Hewitt* Court interpreted the "prevailing party" element in the context of 42 U.S.C. § 1988, this construction of prevailing party is consistent

---

**4.** At least one Court of Appeals has interpreted the Supreme Court decision in *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), as rejecting the catalyst theory. *See S–1 & S–2 v. State Bd. of Educ. of N.C.*, 21 F.3d 49, 51 (4th Cir.1994) (en banc). However, other Courts of Appeals have "expressly concluded that *Farrar* did not repudiate the catalyst theory" or have "continued to apply the catalyst theory notwithstanding *Farrar*." *Friends of the Earth. Inc. v. La idlaw Environmental Servs.*, 528 U.S. 167, 194, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing cases). The Supreme Court has granted certiorari in a case in which the viability of the catalyst theory is directly at issue. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 203 F.3d 819 (4th Cir. 2000), *cert. granted*, 530 U.S. 1304, 121 S.Ct. 28, 147 L.Ed.2d 1050 (2000) (No. 99–1848).

**5.** 42 U.S.C. § 1988 is similar in purpose to EAJA and authorizes a claim for attorney's fees for prevailing parties on certain claims. The statute provides that:

[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 *et seq.*], the Religious Freedom Restoration Act of 1993 [42 U.S.C.2000bb *et seq.*], title VI of the Civil Rights Act of 1964 [42 U.S.C.2000d *et seq.*], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.
42 U.S.C. § 1988(b) (Supp. IV 1998).

with the policy behind EAJA, to compensate parties who cause the government to conform to the law.

## B.  Substantial Justification

█  Regarding the second EAJA requirement, when a party has prevailed in litigation and filed an EAJA claim against the government, the government bears the burden of establishing that its position was substantially justified. *See* 28 U.S.C. § 2412(d)(1)(A); *Comm'r. Immigration & Naturalization Serv. v. Jean*, 496 U.S. at 158, 110 S.Ct. 2316; *Doty v. United States*, 71 F.3d 384, 385 (Fed. Cir.1995) (citing *Gavette v. Office of Pers. Mgmt.*, 808 F.2d at 1465–66; *PCI/RCI v. United States*, 37 Fed.Cl. at 788). The Supreme Court has held that "substantially justified" does not mean " 'justified to a high degree,' but rather 'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). It is no different from the "reasonable basis in both law and fact" formulation used by the majority of Courts of Appeals. *Id.* It does, however, mean more than merely undeserving of sanctions for frivolousness. *Id.* at 566, 108 S.Ct. 2541. Thus, when determining whether the overall position of the United States was substantially justified, a court should "look at the entirety of the government's conduct and make a judgment call whether the government's overall position had a reasonable basis in both law and fact." *Chiu v. United States*, 948 F.2d at 715. As noted earlier with respect to the interpretation of "position of the United States" under EAJA, the government must show that its actions were substantially justified throughout the entire dispute, not just during the litigation phase. *See Gavette v. Office of Pers. Mgmt.*, 808 F.2d at 1467.

Whether the government's position was substantially justified is a factual determination which must be made on a case-by-case basis. *See Cmty, Heating & Plumbing Co., Inc. v. Garrett*, 2 F.3d 1143, 1145 (Fed.Cir. 1993). Objective indicia "such as the terms of a settlement agreement, the stage in the proceedings at which the merits were decided, and the views of other courts on the merits" can be relevant, but are not necessarily conclusive. *See Pierce v. Underwood*, 487 U.S. at 568–69, 108 S.Ct. 2541. Also relevant are the state of the law when the government took its position, *see Owen v. United States*, 861 F.2d 1273, 1274–75 (Fed. Cir.1988), and the factual complexity or novelty of the subject matter, *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 837 F.2d 465, 468 (Fed.Cir.), *cert. denied*, 488 U.S. 819, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988).

## C.  Special Circumstances

The third requirement for the evaluation of an EAJA claim is the consideration of any special circumstances that would make the award of EAJA fees to the plaintiff unjust. *See* 28 U.S.C. § 2412(d)(1)(A); *Comm'r, Immigration & Naturalization Serv. v. Jean*, 496 U.S. at 158, 110 S.Ct. 2316. In *L.G. Lefler, Inc. v. United States*, 801 F.2d 387 (Fed.Cir.1986), the United States Court of Appeals for the Federal Circuit quoted the congressional history of the EAJA to explain the purpose of the "special circumstances" clause:

> This "safety valve" helps to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts. It also gives the court discretion to deny awards where equitable considerations dictate an award should not be made.

*L.G. Lefler, Inc. v. United States*, 801 F.2d at 389 (quoting H.R.Rep. No. 96–1418, at 11, 1980 U.S.C.C.A.N. at 4990).

## D.  Filing Requirements

The fourth EAJA requirement is that the fee application be submitted to the court within thirty days of final judgment in the action and be supported by an itemized statement. *See Comm'r Immigration & Naturalization Serv. v. Jean*, 496 U.S. at 158, 110 S.Ct. 2316. Final judgment means "a judgment that is final and not appealable, and includes an order of settlement." 28 U.S.C. § 2412(d)(2)(G).

## II. Application of EAJA Requirements

### A. Prevailing Party

In the first bid protest, plaintiff requested that the Navy be enjoined from converting the IFB to an RFP and that the Navy be directed to award the contract to Brickwood. In its second complaint, plaintiff requested the court to declare that cancellation of the IFB and resolicitation of the contract under a new IFB was improper and that Brickwood was entitled to an award of the contract. Defendant argues that plaintiff "is not the prevailing party because it failed to obtain the substantive relief sought in its [first] complaint." Defendant contends that because plaintiff ultimately sought an award of the contract in both the first and the second bid protest, plaintiff clearly did not achieve the relief it sought in the first bid protest. The defendant states:

Brickwood suggests in its EAJA application that it prevailed "by stopping the conversion of the solicitation to a negotiated procurement." However, Brickwood's second protest rebuts the suggestion that "stopping the conversion" was the relief sought in this protest. In the second case, Brickwood sought the identical relief that it sought in this case, *i.e.*, award of the contract without any further competition.

■ As noted above, the Court of Appeals for the Federal Circuit has stated that "plaintiffs may be considered 'prevailing parties' for attorney fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Austin v. Dep't of Commerce*, 742 F.2d at 1419 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933 (1983)). Although plaintiff in the first protest did not receive an award of the contract as it had requested, plaintiff significantly contributed to producing a "voluntary action by the defendant that affords the plaintiff all or some of the relief [it] sought through a judgment . . . ." *Hewitt v. Helms*, 482 U.S. at 760, 107 S.Ct. 2672. There is nothing novel or dispositive about the fact that in both protests, the plaintiff's ultimate goal was the award to itself of the contract at issue. The fact that the plaintiff continued to seek an award of the contract to itself in the second protest does not preclude a finding that plaintiff achieved substantive relief in the first bid protest.

■ Although there was no final judgment on the merits issued in the first bid protest, defendant, in its Motion to Dismiss, stated:

At the hearing on the plaintiff's motion for a temporary restraining order [TRO], the Court seriously questioned the decision to convert to a negotiated procurement and suggested that canceling the solicitation and re-soliciting using another sealed bid is the fairest and easiest way to proceed. After further consideration of both the circumstances surrounding the solicitation and the governing FAR provisions, and in light of the Court's comments at the TRO hearing, the Navy has cancelled the solicitation and plans to resolicit using a new IFB.

Defendant's counsel also stated in court:

Cancelling the solicitation is the right thing to do and to proceed with the new IFB. . . . That is the conclusion we reached when we *reconsidered* the facts and circumstances of FAR [p]rovisions and the like and it is the right thing but it is also the fair thing, although fairness isn't discussed in FAR.

(emphasis added). Thus, the Navy's decision not to convert the IFB to an RFP, but to cancel the original solicitation and resolicit was the product of reconsideration by the government, which followed the filing of plaintiff's first bid protest and the ensuing court proceedings on plaintiff's cause of action. In the first bid protest, plaintiff sought to prevent the Navy from completing an announced conversion from an IFB to an RFP, and plaintiff's lawsuit achieved this result by forcing the Navy to reevaluate, cancel and resolicit, instead of pursuing the conversion. The government's reevaluation and subsequent decision not to convert occurred within twenty-eight days after the plaintiff filed its first case requesting injunctive relief, and, as stated by the defendant, "in light of the court's comments at the TRO hearing." The government has offered no alternative explanation for why it changed its mind and proceeded to cancel and issue a new RFP.

The court finds that plaintiff meets the first EAJA requirement because it achieved a result on a significant issue in the litigation, which resulted in a benefit to the plaintiff, and therefore, plaintiff was the prevailing party in the first bid protest.

## B. Substantial Justification

█ Regarding the second EAJA requirement, plaintiff alleges that the agency action of converting the IFB to an RFP was not substantially justified. Defendant argues that the Navy's conversion and decision to conduct price negotiations was substantially justified because the conversion is permitted under FAR 14.404–1. FAR 14.404–1(a)(1) states:

(1) Preservation of the integrity of the competitive bid system dictates that, after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation.

48 C.F.R. § 14.404–1(a)(1) (1999).

FAR 14.404–1(c) enumerates an exhaustive list of the reasons which are sufficiently compelling to justify canceling an invitation for bids after the bids have been opened. FAR 14.404–1(c) states:

(c) Invitations may be canceled and all bids rejected before award but after opening when, consistent with paragraph (a)(1) above, the agency head determines in writing that—

(1) Inadequate or ambiguous specifications were cited in the invitation;

(2) Specifications have been revised;

(3) The supplies or services being contracted for are no longer required;

(4) The invitation did not provide for consideration of all factors of cost to the Government, such as cost of transporting Government-furnished property to bidders' plants;

(5) Bids received indicate that the needs of the Government can be satisfied by a less expensive article differing from that for which the bids were invited;

(6) All otherwise acceptable bids received are at unreasonable prices, or only one bid is received and the contracting officer cannot determine the reasonableness of the bid price;

(7) The bids were not independently arrived at in open competition, were collusive, or were submitted in bad faith . . . ;

(8) No responsive bid has been received from a responsible bidder;

(9) A cost comparison . . . shows that performance by the Government is more economical; or

(10) For other reasons, cancellation is clearly in the public's interest.

48 C.F.R. §§ 14.404–1(c)(1)–(10).

FAR 14.404–1(e) and (f) set forth the appropriate agency action following a cancellation:

(e) Under some circumstances, completion of the acquisition after cancellation of the invitation for bids may be appropriate.

(1) If the invitation for bids has been canceled for the reasons specified in subparagraphs (c)(6), (7), or (8) of this subsection, and the agency head has authorized, in the determination in paragraph (c) of this subsection, the completion of the acquisition through negotiation, the contracting officer shall proceed in accordance with paragraph (f) of this subsection.

(2) If the invitation for bids has been canceled for the reasons specified in subparagraphs (c)(1), (2), (4), (5), or (10) of this subsection, or for the reasons in subparagraphs (c)(6), (7), or (8) of this subsection and completion through negotiation is not authorized under subparagraph (e)(1) of this subsection, the contracting officer shall proceed with a new acquisition.

(f) When the agency head has determined, in accordance with paragraph (e)(1) of this subsection, that an invitation for bids should be canceled and that use of negotiation is in the Government's interest, the contracting officer may negotiate . . . and make award without issuing a new solicitation provided . . . .

48 C.F.R. §§ 14.404–1(e)(1)–(2), (f). Thus, if (e)(1) applies, the FAR permits conversion to a negotiated procurement without a new solicitation. If (e)(2) applies, a new solicitation must be issued following a cancellation.

## 1. FAR 14.404–1(c)(3)

Defendant claims that the Navy relied on both FAR 14.404–1(c)(3) and (c)(6) to justify canceling the IFB. FAR 14.404–1(c)(3) allows for cancellation of an IFB when "[t]he supplies or services being contracted for are no longer required." 48 C.F.R. § 14.404–1(c)(3). Assuming for the moment that the present case fits under the (c)(3) criteria, the FAR (at FAR 14.404–1(e)(1)) does not permit a conversion to a negotiated procurement when an IFB is cancelled under (c)(3). Subsection (c)(3) is not listed in either (e)(1), which lists the circumstances pursuant to which a conversion to an RFP is permitted, or (e)(2), which lists the circumstances in which a new solicitation must be issued. Logically, for those sections not listed under FAR 14.404–1(e), completion of the acquisition is not appropriate because the acquisition is no longer required. The only two unlisted subsections are (c)(3) and (c)(9). Award of a contract is not necessary under (c)(3) because the supplies or services are no longer required, nor under (c)(9) because performance of the solicited work by the government is more economical.

Defendant argues that the omission of (c)(3) from subsection (e) must mean that a cancellation pursuant to (c)(3) may be resolicited either as a new acquisition or through negotiation, and that "contracting officers are presumably free to exercise their own discretion in this situation." However, this interpretation is not supported by the language of the FAR. FAR 14.404–1(e)(1) sets forth a discreet list of the justifications in which a conversion to an RFP is allowed. "The contracting officer may negotiate ... and make award without issuing a new solicitation," 48 C.F.R. § 14.404–1(f), "[i]f the invitation for bids has been canceled for the reasons specified in subparagraphs (c)(6), (7), or (8) of this subsection ...." 48 C.F.R. § 14.404–1(e)(1). Because (c)(3) does not appear on the list of circumstances in which the government may convert to an RFP, the explicit language of the FAR does not permit conversion to a

negotiated procurement after a(c)(3) cancellation.

In addition, (c)(3) is not a valid justification for canceling the IFB in this case. Subsection (c)(3) permits cancellation when "[t]he supplies or services being contracted for are no longer required." 48 C.F.R. § 14.404–1(c)(3). Defendant argues that (c)(3) applies to this case because "a material portion of the services being contracted, namely the testing and disposal of PCBs, were no longer required." Defendant attempts to extend (c)(3) to the current situation in which only a portion of the services are no longer required. However, the language of (c)(3) addresses cancelling the requirement, apparently in its entirety, not a partial cancellation. *See, e.g., S. Systems Corp.*, 95–1 CPD ¶ 221, 1995 WL 248585 (1995) [6] (finding that cancellation of IFB for repairs to an airport runway proper under (c)(3) because the repairs were not necessary until a separate runway project was completed); *Flintstone Crushing & Constr. Co.*, 91–1 CPD ¶ 216, 1991 WL 73005 (1991) (upholding cancellation of an IFB under (c)(3) when construction of a timber access road became unnecessary because defendant discovered that the road was prohibited by a court injunction); *R.H.G. Systems, Inc.*, 86–2 CPD ¶ 380, 1986 WL 64157 (1986) (affirming cancellation of the IFB under (c)(3) when building renovations became unnecessary once the troops housed in the subject buildings were relocated). No cases have been identified in which (c)(3) has been validated as an appropriate basis for cancellation when only a portion of the original solicitation has become unnecessary.

In the present case, the Navy still requires the bulk of the solicited services to be completed. The government admits that, after its attempt to convert, it still needed "[t]o secure a contractor to complete the work that is required and that is to remove these water tanks." Because defendant still requires an award to be made, (c)(3) does not

---

6. Although decisions of the GAO are not binding on this court, they evidence expertise and offer useful guidance. *See Compliance Corp. v. United States*, 22 Cl.Ct. 193, 204 n. 8 (1990), *aff'd*, 960 F.2d 157 (Fed.Cir.1992); *RADVA Corp. v. United States*, 17 Cl.Ct. 812, 822 n. 13 (1989), *aff'd*, 914 F.2d 271 (Fed.Cir.1990); *CACI Field Servs. v. United States*, 13 Cl.Ct. 718, 731 n. 28 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988).

provide a justification for canceling the original IFB issued in this case.

Partial elimination of requirements have justified cancellation under (c)(1). FAR 14.404–1(c)(1) permits cancellation of a solicitation when "[i]nadequate or ambiguous specifications were cited in the invitation." 48 C.F.R. § 14.404–1(c)(1). Cancellation under (c)(1) has been upheld when the requirements of the original solicitation have been partially deleted, as in the present case. *See, e.g., Eastern Technical Enterprises, Inc.*, 99–1 CPD ¶ 17, at 3, 1999 WL 24651 (1999) (affirming cancellation under (c)(1) because "much of the solicited work . . . is no longer needed to meet the agency's actual needs"); *P & C Constr.*, 93–1 CPD ¶ 361, at 2, 1993 WL 156632 (1993) (finding cancellation of the IFB proper under (c)(1) when "some of the work required under the IFB had already been performed"). In the present case, the Navy performed the PCB testing required in the solicitation on its own. The specifications in the original solicitation were deemed inadequate because the Navy no longer required the PCB testing requirement, so that (c)(1) might have supported a cancellation in this case.

Additionally, FAR 14.404–1(c)(2) permits cancellation when "[s]pecifications have been revised," 48 C.F.R. § 14.404–1(c)(2). Cancellation of an IFB under 14.404–1(c)(2) is proper "when an award under the solicitation would not serve the actual needs of the government." *EDL Constr., Inc.*, 99–1 CPD ¶ 34, at 3, 1999 WL 71271 (1999); *accord Zwick Energy Research Org., Inc.*, 91–1 CPD ¶ 72, at 3, 1991 WL 72881 (1991); *Magnolia Inn*, 85–1 CPD ¶ 257, at 3, 1985 WL 52361 (1985). The current case might have been supportable under the (c)(2) criteria because

the original solicitation includes an unnecessary PCB testing requirement and does not reflect the government's current needs.[7]

In *Aviation Enterprises, Inc. v. United States*, 8 Cl.Ct. 1 (1985), a judge of the United States Claims Court examined whether the Air Force had properly cancelled an RFP. *Id.* at 4. The *Aviation Enterprises* court determined that FAR 14.404–1 governed this cancellation because the Air Force cancelled the solicitation after the best and final offers of the bidders had been publicly opened. *Id.* at 20. The solicitation called for a type of aircraft which exceeded the government's needs by requiring "jet aircraft to perform a mission which turbo-prop aircraft could perform. The use of turbo-prop planes would save the taxpayers money." *Id.* at 21. The court considered (c)(1), (c)(2), (c)(5),[8] and (c)(9) as possible justifications for cancellation of the solicitation at issue. Although the court did not attribute the overstatement of specifications to one particular justification, the court identified (c)(1), (c)(2), and (c)(5) as proper bases for cancellation when the government has overstated its needs in the solicitation. *See id.*

Cancellation in the case before this court, based on the changed requirements, might have been appropriate under categories (c)(1) or (c)(2). A determination regarding which category applies, (c)(1) or (c)(2), however, does not affect the disposition of this case because neither category supports a conversion to an RFP. Subsection (e)(2) controls the government's conduct after a cancellation under (c)(1) or (c)(2). FAR 14.404–1(e)(2) provides, "[i]f the invitation for bids has been cancelled for the reasons specified in subparagraphs (c)(1), (2), (4), (5), or (10) of this

---

7. FAR 14.404–1(c)(2) generally has been applied as a basis for cancellation when the specifications have been changed or when additional requirements were needed. *See, e.g., Robert Hall Assocs., Inc.*, 95–2 CPD ¶ 189, 1995 WL 625608 (1995) (upholding cancellation under (c)(2) when the Army required additional landscaping services not reflected in the original solicitation); *Zwick Energy Research Org., Inc.*, 91–1 CPD ¶ 72, 1991 WL 72881 (1991) (finding cancellation under (c)(2) proper when the Army required air compressors designed to use diesel fuel rather than the gasoline-type fuels allowed in the original solicitation); *Snowbird Indus., Inc.*, 87–1

CPD ¶ 630, 1987 WL 102534 (1987) (affirming cancellation under (c)(2) when the government required a different type of stainless steel and additional specifications in the design of ice cube making machines).

8. FAR 14.404–1(c)(5) is not a proper justification in the present case because the nature of the present overstatement is a partial deletion of requirements, not the opportunity to procure a "less expensive article" that will satisfy the government's needs. *See* 48 C.F.R. § 14.404–1(c)(5).

subsection, ... the contracting officer shall proceed with a new acquisition." 48 C.F.R. § 14.404–1(e)(2). Subsection (f), which governs conversions to a negotiated procurement, does not apply to the present case. To fit into the criteria for a conversion to negotiation under subsection (f), the original solicitation must have been cancelled for the reasons specified in subsections (c)(6), (7), or (8). *See* 48 C.F.R. § 14.404–1(e)(1). Because under the applicable regulations, the elimination of the PCB requirement provides a justification under (c)(1) or (c)(2), the change in the requirements should have resulted in a cancellation followed by the issuance of a new solicitation. *See* 48 C.F.R. § 14.404–1(e)(2). The Navy's attempted conversion to a negotiated procurement allegedly based on 14.404–1(c)(3) prior to the initial filing of plaintiff's first complaint filed in this court was unjustified under the FAR.

## 2. FAR 14.404–1(c)(6)

Alternatively, defendant argues that it justifiably cancelled the IFB pursuant to FAR 14.404–1(c)(6), which permits cancellation when "[a]ll otherwise acceptable bids received are at unreasonable prices, or only one bid is received and the contracting officer cannot determine the reasonableness of the bid price." 48 C.F.R. § 14.404–1(c)(6). Defendant argues that "each bid received in connection with the original solicitation was either unreasonable or incapable of being characterized as either reasonable or unreasonable."

Defendant contends that the "significant disparities in the bids" leading to the Navy's request for a bid analysis,[9] and the independent consultant's determination that "a majority of the bidders misinterpreted the requirements relating to PCBs" show that the

bids were unreasonable. However, the FAR permits cancellation under (c)(6) when all the bids received are unreasonable. *See* 48 C.F.R. § 14.404–1(c)(6); *see, e.g.,* Howard W. Pence, Inc., 97–2 CPD ¶ 150, at 2, 1997 WL 724544 (1997); *J. Morris & Assocs.,* 94–2 CPD ¶ 47, at 1–2, 1994 WL 396414 (1994); *Metric Constructors, Inc.,* 88–1 CPD ¶ 311, at 2, 1988 WL 227291 (1988). In the instant case, the independent consultant indicated that two bidders interpreted the bid options properly and that the distribution of base bids was "common and appropriate." An unsupported allegation of disparities in the bids and the independent consultant's conclusion that some of the bidders may have misinterpreted the PCB requirements are insufficient to cancel the solicitation under the language of FAR 14.404–1(c)(6).

Defendant also alleges that because the base bids included the cost of unnecessary PCB testing and because the Navy could not evaluate the cost of the PCB testing as opposed to the base bids, the Navy could not determine the reasonableness of the base bids. Defendant argues that the Navy's inability to determine the reasonableness of the bids provides sufficient justification to cancel under (c)(6). FAR 14.404–1(c)(6), however, allows for cancellation of the IFB only when all bids are received at unreasonable prices, or only one bid is received and the contracting officer cannot determine the reasonableness of the bid price. *See* 48 C.F.R. § 14.404–1(c)(6). Subsection (c)(6) does not permit cancellation in situations like the present case. Here, the Navy received five bids, and there is no evidence in the record that all five bids were unreasonable or that a determination of unreasonableness was made. Thus, the requirements for a(c)(6) cancellation have not been met in this case.

9. The Navy requested a bid analysis because "it appear[ed] that bids [were] unbalanced," not because of "significant disparities in the bids." An "unbalanced bid" has a specific meaning in the area of government acquisitions. FAR 52.214–10(e) provides:

A bid is materially unbalanced when it is based on prices significantly less than cost for some work and prices which are significantly overstated in relation to cost for other work, and if there is a reasonable doubt that the bid will result in the lowest overall cost to the Govern-

ment even though it may be the low evaluated bid, or if it is so unbalanced as to be tantamount to allowing an advance payment.

48 C.F.R. § 52.214–10(e) (1999). Defendant does not allege that any bids were rejected because of a material imbalance within the meaning of FAR 52.214–10(e). In addition, the independent consultant did not provide conclusions regarding any imbalance in the bids. Thus, the court need not address the issue of unbalanced bids within the meaning of FAR 52.214–10(e).

In addition, the Navy inappropriately relies on (c)(6) because the cause of the Navy's alleged inability to determine the reasonableness of the bids is the inaccurate or changed specifications. If an invitation for bids contains inaccurate requirements, the deficiency is not in the bids, but in the specifications. Under defendant's view of the facts, whenever an IFB contains inaccurate specifications and requests a lump sum bid, the IFB could be cancelled under (c)(6) with the government's claim that it cannot sever the defective component from the base bid. In other words, any IFB that requested a lump sum bid and could be cancelled under (c)(1) or (c)(2) also could be cancelled under (c)(6). This result would diminish the effect of subsection (e), which governs post-cancellation procedures. The distinction made in subsection (e) between justifications in which a conversion is permitted and justifications in which a new solicitation is mandated would be lost under defendant's interpretation. For example, if the government had issued inadequate specifications and sought to cancel the IFB, but wanted to avoid the new solicitation mandated by (e)(2), the government could simply invoke (c)(6), claiming that it was unable to determine the reasonableness of the bids and convert to an RFP under (e)(1). In the present case, any inability to determine the reasonableness of the bids is the result of the inaccurate or changed requirements. As noted above, the defective requirements in this case will only support a cancellation under FAR 14.404–1(c)(1) or (c)(2), followed by the new solicitation required by FAR 14.404–1(e)(2).

The contracting officer is vested with broad authority to cancel an IFB based on the unreasonableness of the prices bid pursuant to 14.404–1(c)(6). *See Overstreet Elec. Co., Inc. v. United States*, 47 Fed.Cl. 728, 732 (2000) (quoting *Caddell Constr. Co. v. United States*, 7 Cl.Ct. 236, 241 (1985)). In this record, however, there is no evidence demonstrating that the Navy actually believed that the bids received were unreasonable. Amendment 0005, which converted the IFB to an RFP, did not provide any justification for the conversion. At the hearing regarding plaintiff's request for a Temporary Restraining Order, defendant stated that the basis for the attempt to convert to an RFP rested solely on the elimination of the PCB testing requirement.[10] At this hearing, defendant did not state that the unreasonableness of the bids also served as a basis for the conversion. Later, when the Navy decided to cancel the IFB instead of converting to an RFP, the Navy again did not cite to the unreasonableness of the bids as a basis for the cancellation. In its Determination and Findings issued on July 16, 1999, just before cancellation of the original solicitation, but after the filing of the first lawsuit, the Navy stated: "The material revisions that must be made to the otherwise inadequate or ambiguous specifications for this project warrant cancellation and re-solicitation." The Navy then concluded that, "[b]ecause the criteria set forth in FAR 14.404–1(c)(1) and (c)(2) have been met, the agency will cancel the solicitation and proceed with a new acquisition pursuant to FAR 14.404–1(e)(2)." Thus, even after the first protest was filed, the Navy did not

10. The court inquired into the basis for the government's decision to convert in the following exchange:

THE COURT: ... What was the basis [for the conversion], as you understand it, and what documents do I look at to determine that ... this was not an arbitrary and capricious act on the part of your client?

❊ ❊ ❊

MR. FAVER (Defendant's Counsel): ... What had happened was there were options along with the original I.F.B. ... And those options were in large part connected with some testing—PCB-testing requirements in the initial I.F.B. As a result, some confusion had occurred. The contracting officer, in the light, decided, well, we'd better go out and just test it ourselves and make this determination whether or not there's PCB

paint that needs to be removed and disposed of and then remove all of that confusion, remove the particular testing requirements which, ... could be a very significant sum of money that constitutes this particular solicitation.... The testing component, the PCB-testing component, could be a material part of this solicitation. And the fair thing to do, the right thing to do, is say, hey, you know, let's delete this requirement and let the people who participate in the I.F.B. now—, absent this requirement.

❊ ❊ ❊

THE COURT: ... Mr. Faver, is it in fact accurate for Plaintiff to describe your basis [for the Navy's action] as wholly the PCB issue—

MR. FAVER (Defendant's Counsel): Yes, Your Honor.

mention the unreasonableness of the prices bid or FAR 14.404–1(c)(6) as a basis for cancellation. Although the government is allowed to "advance its post hoc justifications for the cancellation," *Vanguard Sec. Inc. v. United States*, 20 Cl.Ct. 90, 111 (1990), the government has presented no evidence that suggests that the Navy could substantiate a finding that the base bids were unreasonable.

FAR 14.404–1 specifically limits the contracting officer's discretion regarding whether the government may cancel an IFB, whether the government may complete the acquisition after a cancellation, and how the government should complete the acquisition. The FAR provides explicit detail regarding the situations under which a cancellation is permitted after the opening of bids, and a discreet list of the circumstances in which the government may convert to an RFP. In the present case, the Navy could not have cancelled the IFB under (c)(3), (c)(6), or any justification which could have led to a conversion. Because the PCB testing requirements needed to be deleted, the Navy could have and ultimately did base its cancellation on the "inadequate or ambiguous specifications" and cancelled pursuant to (c)(1) and (c)(2). Under the FAR, however, a cancellation pursuant to (c)(1) or (c)(2) can only be followed by a new solicitation. Thus, the Navy's attempted conversion to an RFP was not substantially justified.

### 3. Procedures for cancellation of IFB

Moreover, the Navy failed to follow the procedures set forth under FAR 14.404–1. The bids were opened on April 6, 1999, the Navy attempted to convert to a negotiated procurement on June 15, 1999, the plaintiff filed its bid protest on June 18, 1999, and the solicitation was cancelled on July 16, 1999. FAR 14.404–1 specifically outlines the IFB cancellation procedures after bids have been opened. First, award is to be made to the lowest bidder, unless there is a compelling reason to cancel the bids. 48 C.F.R. § 14.404–1(a)(1). Second, if a compelling reason arises, the IFB must be cancelled and all bids rejected. 48 C.F.R. § 14.404–1(c). Third, the agency head or designate must determine, in writing, that the IFB is to be

cancelled for one of the reasons enumerated in FAR 14.404–1(c). *Id.* Finally, after the IFB is cancelled, the agency head must follow the post-cancellation procedures under FAR 14.404–1(e), which may permit a conversion to an RFP or mandate the issuance of a new solicitation. 48 C.F.R. § 14.404–1(e).

Here, the Navy did not cancel the solicitation until after it had attempted to convert to a negotiated procurement. In fact on June 15, 1999, Amendment 0005 extended the solicitation stating, "[b]y amendment, this Invitation for Bids (IFB) will be converted to a Request for Proposal (RFP) . . . ." On July 16, 1999, after plaintiff protested the conversion on June 18, 1999, the defendant issued Amendment 0009, which stated, "[t]he subject solicitation is hereby cancelled in its' [sic] entirety." Defendant's attempt to convert before cancelling the IFB is not permitted under the procedures outlined in the FAR. *See* 48 C.F.R. § 14.404–1(e).

Finally, defendant has failed to produce for the court the written documentation required by FAR 14.404–1. Section (c) provides that "[i]nvitations may be cancelled and all bids rejected before award but after opening when . . . the agency head determines in writing that [one of the enumerated justifications apply]." 48 C.F.R. § 14.404–1(c). The defendant admits that "the Navy did not prepare a written determination and findings prior to issuing Amendment 0005 . . . ." The defendant attempts to justify the agency head's failure to document its rationale in writing by citing to *Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 345 (1997). However, *Cubic* merely stands for the proposition that the absence of a Determination and Findings is not dispositive. *See id.* at 357–58. Instead, the court must "ask whether it is in the public interest to insist on adherence to the requirements of [the statute] in the present circumstances." *Id.* at 357. Although the defendant characterizes the preparation of a Determination and Findings as "a matter of form rather than substance," it is a requirement of FAR 14.404–1. Had the defendant followed the procedures set out in the FAR, the government might have identified the applicable conversion re-

quirements also set out in the FAR. Based on the Navy's failure to follow procedures, viewed in conjunction with the unauthorized conversion to a negotiated procurement, this court finds that the defendant acted improperly when it failed to comply with FAR 14.404–1. No reason has been identified as to why it is in the public's interest to condone the defendant's behavior in this case. Thus, the second EAJA requirement is satisfied because defendant was not substantially justified when it attempted to convert the solicitation from a sealed bid to a negotiated procurement and when it failed to follow the procedures required by the FAR for cancellations of IFBs.

### C. Special Circumstances

The defendant contends that the third EAJA requirement absolves the defendant of any liability for EAJA fees and costs because equitable considerations exist that make an award to Brickwood unjust. First, defendant argues that Brickwood brought three bid protests in the Court of Federal Claims in 1999 that were dismissed, and that "[n]ot one of the protests has served an interest of justice or even accrued a benefit to Brickwood." In essence, the defendant appears to argue that Brickwood is filing frivolous suits that waste the court's time and unnecessarily delay government projects. Plaintiff, however, correctly points out that "Brickwood has appeared before this Court on *one* other matter separate from the [two] protests filed regarding the Patuxent River Naval Air Station." (emphasis in original). In addition, this court finds that the protest underlying the present EAJA claim was not frivolous or conducted in a frivolous manner and that the plaintiff was the prevailing party. Thus, the court rejects defendant's implication that plaintiff does not deserve an EAJA award due to special circumstances.

The defendant also argues that "the Navy converted to a negotiated procurement based in part out of fairness to Brickwood." The

defendant implies that absent a conversion to an RFP, the plaintiff would have had no chance at being awarded the contract because the Navy would have evaluated only the base bids for award purposes. If the options bids were excluded from the evaluation, plaintiff would have been displaced as the low bidder. The defendant argues that the Navy gave the plaintiff another chance at the contract when the Navy attempted to procure through an RFP. However, canceling the first IFB and resoliciting another IFB also would have afforded plaintiff another chance at bidding for the contract, while placing the Navy in compliance with the FAR. Ultimately, defendant did cancel and resolicit using an IFB, which led to an award to plaintiff. Regardless of defendant's alleged motivations for attempting to convert. to an RFP, the fact remains that the Navy's conversion to a negotiated procurement was not substantially justified under the FAR, and the plaintiff's first lawsuit was instrumental in forcing the Navy to conform. The court finds that defendant has not raised sufficient grounds for a ruling of special circumstances in defendant's favor.

### D. Filing Requirements

Plaintiff has satisfied the filing requirements mandated under the fourth EAJA requirement. On July 22, 1999, the court dismissed the first protest and judgment was entered because the government had decided not to convert the solicitation to an RFP, but rather to cancel the solicitation and resolicit. Plaintiff filed its EAJA application with an itemized statement on August 23, 1999, within the thirty days allowed under 28 U.S.C. § 2412(d)(1)(B).[11] Therefore, plaintiff has met the filing deadline. Plaintiff also has provided the supporting documents required for an EAJA claim. Defendant has not claimed otherwise.

### III. Amount of Damages

Although defendant asserts that the amount of plaintiff's requested fees are un-

---

11. Starting the calculation on Thursday, July 22, 1999, the thirty days runs until Saturday, August 21, 1999. Rule 6(a) of the Rules of the United States Court of Federal Claims provides that "[t]he last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, ... in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday." The deadline, therefore, for the filing of the plaintiff's EAJA claim was Monday, August 23, 1999.

**164**

reasonable, the court finds that, in large part, plaintiff's itemized statement reflects reasonable amounts of time spent on tasks necessary to provide the plaintiff with effective representation and demonstrates time proportionate to the work product received by the court. The only request that is rejected by the court is reflected in a portion of the billing entry for July 22, 1999. In this entry, the plaintiff represents that an associate spent 2.10 hours performing the following tasks:

> Telephone conference with Paul Faver regarding Order dismissing Bid Protest Complaint. Review government's proposed dismissal order. Telephone conference with RMMoore regarding proposed order. Prepare changes and finalize dismissal order. Telephone conference with V. Kalos regarding New Complaint protesting cancellation of solicitation. Telephone conference with RMMoore regarding V. Kalos's suggested changes. Finalize new Complaint.

To the extent that a portion of the 2.10 hours was spent on tasks related to the preparation of the "New Complaint" filed with this court on July 23, 1999, this time is disallowed. The plaintiff has presented no evidence that the second protest of July 23, 1999 meets the four EAJA requirements, and fees to cover plaintiff's second bid protest were excluded in plaintiff's EAJA request currently under consideration by the court. With the exception of time spent on preparing the complaint for the second protest, the court finds that all time reflected in the plaintiff's application for attorneys' fees should be included in the calculation of the final award.

■ EAJA establishes a statutory cap of $125.00 per hour, but allows for adjustments above the statutory cap, if "the court determines that an increase in the cost of living ... justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A) (Supp. IV 1998). Plaintiff requests the court to award attorneys' fees reflective of "the increase in the cost of living from March 1996, the effective date of the EAJA statutory cap to June–August 1999, the dates the legal services were provided." Defendant has raised no objection to a cost of living increase. An increase in the rate of attorney's fees to account for cost of living adjustments (COLAs) may be awarded at the discretion of the court. See Levernier Constr., Inc. v. United States, 947 F.2d 497, 503 (Fed.Cir.1991); Oliveira v. United States, 827 F.2d 735, 742 (Fed.Cir.1987). The base date from which to begin the calculation of COLAs is the effective date of the statutory cap, March 29, 1996. See California Marine Cleaning, Inc. v. United States, 43 Fed.Cl. 724, 733–34 (1999) ("Although the Federal Circuit and other circuits have advocated use of October 1981 as the appropriate baseline, the selection of that particular month was tied indivisibly to the October 1, 1981 effective date of the $75 statutory cap in effect at the commencement of the underlying litigation. The EAJA, however, was amended in 1996, raising the statutory cap to $125.... Consequently, March 1996 is the proper baseline for calculation of a COLA to the $125 cap.") (citations omitted). The end date for the calculation of COLAs is the date legal services were rendered. Id. (citing Doty v. United States, 71 F.3d 384, 387 (Fed.Cir.1995)). A COLA award justifiably offsets the decrease in the value of the $125.00 rate due to inflation. This court joins the California Marine Cleaning court in declining "to impose a requirement that an applicant must do more than request such an adjustment and present a basis upon which the adjustment should be calculated." Id. at 733.

Although the court finds that a COLA award is justified, the plaintiff in the present case has not provided a complete calculation of the attorneys' fees owed. The plaintiff requests reimbursement for attorneys' fees incurred from June 16, 1999 through August 20, 1999. Because the cost of living increase, as measured by the Department of Labor's Consumer Price Index (CPI), is adjusted every month, fees billed in each month from June through August 1999 should be adjusted based on the CPI figure for each respective month. See id. at 734; Gonzalez v. United States, 44 Fed.Cl. 764, 771 (1999). The plaintiff asserts that the appropriate rate for attorneys' fees, based on the CPI for July, 1999, is $133.83 per hour. The calculation of the rate for attorneys' fees appears to be incomplete. The plaintiff must provide

the court with a calculation for attorneys' fees, adjusted for the COLA, which reflects the CPI figures for each month in which fees were incurred.

### CONCLUSION

The court finds that the plaintiff has satisfied all four elements required to succeed on an EAJA claim.[12] Thus, the court finds the defendant liable to the plaintiff for EAJA fees and expenses. The court, hereby, **ORDERS** the parties to consult, and to file a joint status report on or before **Monday, April 30, 2001,** addressing the proper computation for an EAJA recovery, consistent with this opinion, taking into consideration the adjustment of the number of hours and the appropriate rate for attorneys' fees.

**IT IS SO ORDERED.**

---

12. Defendant argues that if plaintiff's EAJA application is granted, the judgment against the government should be offset by the "outstanding bill of costs for $2,426.25 pending in Brickwood's subsequent protest (Case No. 99–482C) ...." The proposed offset, however, relates to the second bid protest, while the EAJA application currently under consideration by the court relates only to the first bid protest. Therefore, defendant's request for an offset is denied.